**FILED**
**APRIL 19, 2022**
In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 38561-2-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| SEXTON ONEAL CLEARY, a/k/a | ) | |
| SEXTON O CLEARY, | ) | |
| SEXTON ONEIL CLEARY, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — Sexton Cleary appeals after being convicted of five counts of violation of a domestic violence protection order and one count of witness tampering. He raises two claims on appeal. We decline to review his first claim, reject his second claim, and affirm his convictions.

FACTS

Sexton Cleary was arrested for violating a no-contact order. While in jail, he called the protected person multiple times and encouraged her not to testify at his trial. Despite her not appearing, a jury convicted Cleary on all counts. We begin by discussing the facts that landed Cleary in jail.

*Initial contact and arrest*

Late at night on May 10, 2019, Heather Richardson called 911 to report that Cleary was at her house in violation of a domestic violence protection order. The call to 911 was made from 253-239-8319. The caller terminated the call, and the call center called Richardson back. On this second call, Richardson said Cleary had taken her keys and hidden them, and she would not be able to go to work in the morning. She asked to meet the responding Pierce County sheriff's deputies in the parking lot of an Ace Hardware across the street from her house.

An anxious Richardson met two deputies at the agreed location. She then saw Cleary walking through the parking lot and she hid behind a patrol car and pointed him out.

As one of the deputies drove toward Cleary, he began to run away. Cleary crossed Pacific Avenue, a busy street adjacent to the parking lot, multiple times. Soon after losing sight of him, the deputy received a report that a Tacoma police officer had seen a shirtless man running northbound on Pacific Avenue where it crossed over Highway 512. The deputy then located Cleary on the far side of Highway 512, approximately one-half mile from where he started running. The deputy confirmed Cleary's identity and the

2

existence of the no-contact order protecting Richardson.  He then arrested Cleary and took him to the Pierce County jail.  Cleary's bond was set at $30,000.

*Jail telephone calls*

When inmates are booked into the Pierce County jail, they have an account created for them on the telephone system.  They get a personal identification number (PIN), which they are required to use when making telephone calls.  They also record pre-established sentences, from which the phone system software can identify callers by voice, independent of their PIN.

When jail staff searched for calls made by Cleary during his time in jail, they found 45 calls he made using his own PIN.  In addition, the voice recognition software located 5 additional calls made with different inmates' PINs that featured Cleary's voice.  The calls from different PINs were all made to 253-239-8319, the number belonging to the phone used by Richardson when she had called 911.  We describe the date and the substance of the calls below.

*May 20, 2019*

Using the PIN of Jerry Hipolito, Cleary called Richardson at 253-239-8319.  During the call, Cleary asked Richardson, "You're trying . . . you want [sic] say something?"  Pretrial Ex. 6, at 2.  Richardson responded, "I don't know what to say.  I'm

3

sure—I wrote—I can't really say anything on this phone, can I?"  Pretrial Ex. 6, at 2.

Cleary told her he needed to talk to her and asked her to bail him out.  Richardson

responded, "I want to do that, but you're going to fuck up my life."  Pretrial Ex. 6, at 3.

Later that day, using his own PIN, Cleary called Aladdin Bail Bonds.  In the

automated message that indicated the call was from an inmate at Pierce County Jail,

Cleary had recorded his name as "Pookie."  Trial Ex. 8, Call 1, at 0 sec. through 7 sec.

Cleary then identified himself to the bond company employee as Sexton Cleary.  *Id.* at

38 sec. through 41 sec.  The employee then told Cleary that he had talked to someone

named Heather about Cleary's bail.  *Id.* at 52 sec. through 1 min.; 1 min., 18 sec. through

1 min., 23 sec.

*May 23, 2019*

Using the PIN of Kevin Jones, Cleary called Richardson at 253-239-8319 at

4:56 p.m. and again at 5:21 p.m.

After discussing bail in the first call, Richardson told Cleary she did not want to be

responsible for "the whole 30 grand" if he did not show up to his hearing.  Pretrial Ex. 7,

at 5.  Cleary told Richardson, "Listen to me.  Like, I'm going to show up because I'm

going to go all the way to trial.  If that person who—my victim.  If she don't come to trial,

they're going to throw this shit out.  You feel me?"  Pretrial Ex. 7, at 5.  Richardson

suggested that if the victim showed up for Cleary's pretrial hearing and testified it was not Cleary, they might release Cleary on his personal recognizance.  She mentioned she had already requested the day off "to see if she comes."  Pretrial Ex. 7, at 7.  She said she wanted to get Cleary out of jail, but afterward she was "not dealing with this stupid shit."  Pretrial Ex. 7, at 7.

Cleary told Richardson, "like you said you took that day off, but like . . . if motherfucker was to go and speak to the . . . .  The prosecutor or whoever.  And like—it's just like—she wants to be like, you know—say something to the motherfucking prosecutor . . . ."  Pretrial Ex. 7, at 11.  He told her he was going to take his charges to trial.

Cleary asked Richardson to send him a package and she told him she could not afford to send a package and pay his bail.  Cleary offered Richardson an old telephone and she asked if he meant the same phone they had fought about.  She told him to "[k]eep your fucking phone, dude.  Just stay away from me when you get out.  I can't deal with this voodoo crazy shit no more."  Pretrial Ex. 7, at 19.  She told him she could not afford all the things he was asking from her and mentioned she did not have a house key, then asked him, "Where are my keys?"  Pretrial Ex. 7, at 20.  Cleary told Richardson they were

"in that parking lot across the street somewhere." Pretrial Ex. 7, at 20. The call ended automatically after 20 minutes.

In the second call, Richardson expressed frustration that Cleary kept calling and just wanted packages and money. Cleary told Richardson:

> But like I was saying, though, if she was to pop up and talk to the prosecutor and tell the prosecutor—I don't know. You know what I'm saying? Whatever. It would be—
> . . . .
> . . . I don't know. I'd take it from there. Like, I don't know. Maybe it would made [sic] it look good like if she was going to tell the prosecutor whatever she tell the prosecutor, but the prosecutor who is trying to prosecute the motherfucker is for real on this.

Pretrial Ex. 8, at 3-4.

Richardson responded, "I wrote a—oh, nevermind. Oooh-oh." Pretrial Ex. 8, at 4. Cleary asked Richardson if she wrote a letter to somebody. Richardson answered, "Nope. I didn't. . . . I heard that your alleged victim did. . . . Wrote a letter to the prosecutor." Pretrial Ex. 8, at 4.

After discussing bail again, Richardson told Cleary after he got out, he had to leave her alone. Cleary started complaining about the conditions in jail and Richardson told him, "It's your own fucking fault, man. I don't know why the fuck you have to . . . . I don't know what the fuck the problem is." Pretrial Ex. 8, at 12. Cleary responded,

6

"You're making it go away. . . .  What time is court on the 28th?  Do you know?"  Pretrial Ex. 8, at 12.

After Richardson said court made her nervous, Cleary boasted, "The night I ran from the girl . . . I ran across 512."  Pretrial Ex. 8, at 13.  Richardson asked, "Are you serious, Pookie?  You almost died."  Pretrial Ex. 8, at 13.  She told him he was lucky he was not dead, and told him, "Damn, Pookie, you're stupid."  Pretrial Ex. 8, at 14.

*June 6, 2019*

Using the PIN of Kevin Jones, Cleary called Richardson at 253-239-8319.  Richardson said she had taken the day off for his court date but had not come since the judge was not going to be there.  She said she had taken the day off for his next court date on June 11, but had gotten a citation for driving with a suspended license and had a mandatory hearing on June 11.  She said she had been pulled over because of her tabs near a Grocery Outlet.

Richardson asked again where her keys were, saying, "I still don't have a key to my house, Pookie."  Pretrial Ex. 9, at 6.  Cleary told her they were hidden and he had them.  Richardson asked, "So when you get out, are you gonna like come into my house when I'm like at work and like take my car while I'm sleeping and stupid shit like that?"  Pretrial Ex. 9, at 7.  Cleary told her he would not.

After talking about Cleary getting out, Richardson said, "You are at the wrong place at the wrong time, and—" Pretrial Ex. 9, at 8. Cleary interrupted and said, "I was in the area, and then like the—where is she—I don't know why called [sic] and said all that bullshit on me." Pretrial Ex. 9, at 8-9. Richardson told him that he would have to take things all the way to trial. Cleary responded, "[*T*]*hey can't convict me without . . . without the victim. No victim. No case. So like if she don't show up . . . I'm good.*" Pretrial Ex. 9, at 10 (emphasis added). Richardson answered, "Okay." Pretrial Ex. 9, at 10.

> *June 7, 2019*

Using the PIN of Kevin Jones, Cleary called Richardson at 253-239-8319. They discussed bail and Cleary getting out that day. Richardson asked, "[W]hen you do get out, like I'm going to see you tonight. Like, are you going to be beefing with me because I don't feel like doing that?" Pretrial Ex. 10, at 3. Cleary told Richardson he would hug her and give her a kiss on the forehead. Richardson responded, "Really? Like, you're not going to kill me? Oh, my God." Pretrial Ex. 10, at 4. After Cleary told her to quit talking like that, Richardson said she was just kidding.

Cleary and Richardson discussed her putting money on someone's telephone account, and she told him, "[A]ll I know is, his name is Kevin. I can't look your shit up

like that." Pretrial Ex. 10, at 5. Richardson told Cleary she needed Kevin's last name.

After Cleary talked to someone on his end of the line, he told her it was Kevin Jones.

Cleary told Richardson not to put any money on his own account because he would be

getting out that night. Richardson said she would see him that night.

*Richardson's activities*

While Cleary was in jail, Richardson sent a letter to the prosecutor's office. The

letter was dated May 13, 2019, three days after she called 911 and Cleary was arrested. In

the letter, Richardson stated her keys were taken by her boyfriend who goes by "P.K."

Pretrial Ex. 5. She believed his first name was either Preston or Justin and was not sure

of his last name. She said that because she did not have a lot of information about P.K.,

the police picked up Sexton Cleary, who was there by coincidence. She claimed she had

not spoken to Sexton Cleary in years and he had nothing to do with the incident for which

she called 911. She said P.K. had given her belongings back and was still making threats

and coming to her job, but she could not get a protection order because she did not know

his last name. She concluded, "I am submitting this statement in hopes that Sexton

Cleary may be cleared of all alligations [sic] and charges he's being held on. I have no

desire to engage in contact with Mr. Cleary and as far as I know or can prove neither does

he with me." Pretrial Ex. 5.

9

On June 2, 2019, Richardson was pulled over for expired tabs in Tacoma. She was stopped on the corner of South 56th Street and South Tacoma Way; on the southeast corner of the intersection is a strip mall that includes a Grocery Outlet. Richardson was cited for driving while license suspended in the third degree. She was given a court date of June 11 for the charge.

In February, March, and September 2020, the State repeatedly and unsuccessfully tried to serve a subpoena on Richardson to secure her appearance as a witness. Her phone number, 253-239-8319, no longer worked and, according to a neighbor, Richardson had moved out of her previous residence in August 2019.

*Motion in limine to admit hearsay statements*

In a motion in limine, the State moved to admit Richardson's statements made in the 911 calls and jail calls as well as statements made to law enforcement. Citing ER 804(b)(6), the State argued that Cleary had forfeited his objections to any hearsay statements made by Richardson because it was his wrongdoing that brought about her unavailability as a witness.

The State relied on the five calls between Cleary and Richardson that were made from other inmates' PINs. It noted that although the parties never identified themselves on the calls, the court could compare Cleary's voice on the calls to his voice on the call to

the bail bondsman and Richardson's voice to her voice on the 911 calls. It also pointed to

a number of other indicia of identity, including:

- Richardson's statements she had written a letter to the prosecutor, which began in first person and shifted to third person as she seemingly caught herself;

- The discussion of the location Richardson's keys, which Cleary had stolen the night of his arrest;

- Richardson addressing Cleary as "Pookie," like in his recorded greeting;

- Cleary's statement about running across Highway 512 like he had the night of his arrest;

- Richardson's description of receiving a citation by Grocery Outlet with a court date on June 11, which public records corroborated; and

- While calling from a PIN associated with Kevin Jones, Cleary telling Richardson to put money in Kevin Jones's account, not the speaker's account.

*See* Clerk's Papers at 95-98.

The State argued in its motion that Cleary caused Richardson to be unavailable

through his statements about how the State could not convict him if the victim did not

show up to court.

11

At the hearing on the motion, the State argued it had clear, cogent, and convincing evidence that Cleary engaged in forfeiture by wrongdoing. It stated the prosecutor's office had not had contact with Richardson since 2019. The State noted the determination of forfeiture was "a little convoluted in the sense that the Court also has to determine that the defendant was the one engaging in that forfeiture." 1 Report of Proceedings (RP) (Oct. 13, 2020) at 24. The State briefly outlined the evidence going toward identity and told the court it would move on to discuss the forfeiture itself unless the court had questions. It argued that it was foreseeable to Cleary that his actions would result in the witness being unavailable. It argued that while Cleary never specifically intimidated or threatened Richardson, the calls reflected a pattern of manipulation that ensured Richardson would not be available for trial.

In response, Cleary's attorney stated:

> [A]t trial, the State's going to have to prove that Mr. Cleary is the one speaking in these jail phone calls. But for the purpose of this motion, I'm not contesting it is the identity or that he is the person speaking these words that are in these jail phone calls . . . .

1 RP (Oct. 13, 2020) at 30. Defense counsel argued that Cleary never told Richardson to absent herself from proceedings and characterized Cleary's comments as musings about possible defenses. He argued that the evidence required "a step of further conjecture" and

12

No. 38561-2-III
*State v. Cleary*

thus the State had not proved forfeiture by wrongdoing by clear, cogent, and convincing evidence. 1 RP (Oct. 13, 2020) at 31.

The court took the matter under advisement and delivered its oral ruling the next morning before trial started. The court noted that Richardson was initially cooperative when she made the 911 call and then, shortly after, wrote the letter to the prosecutor's office in which she claimed mistaken identity. Discussing the jail phone calls, the court did not make a finding on identity but stated, "[*F*]*or purposes of my ruling I'm going to presume that the male, Speaker 1, on all the jail phone calls is the defendant, the female speaker, 2, is Ms. Richardson.*" 2 RP (Oct. 14, 2020) at 45 (emphasis added). The court discussed Cleary's and Richardson's understanding that they should not discuss the incident on the telephone and their references to the victim as an unidentified third person. It pointed to their repeated discussions of what would happen if Cleary's victim did not show up and Richardson's statements that Cleary would need to leave her alone when he got out.

The court stated "what was most persuasive in this case" was the fact that Richardson was apparently going to allege mistaken identity until her telephone calls with Cleary, at which point she decided to stop participating altogether. 2 RP (Oct. 14, 2020)

13

at 48.  It also noted the history of Cleary and Richardson's relationship, which included

assault against Richardson and violation of protection orders.  The court concluded:

> So based on all of those, the phone calls, the comments that were
> made in the phone calls, the change in strategy from the victim's
> perspective when those calls came through, in addition to the history that
> we have here of convictions for domestic violence that involve the same
> victim, I do find by clear, cogent, and convincing evidence that the
> defendant's actions in contacting Ms. Richardson about not showing up are
> what caused her to stay away from these proceedings.

2 RP (Oct. 14, 2020) at 49-50.  The court admitted the hearsay statements of Richardson,

"assuming identity and all of that can be established."  2 RP (Oct. 14, 2020) at 50.

*Trial and sentencing*

The State, by amended information, charged Cleary with five counts of felony

violation of a domestic violence protection order: one count for the conduct leading up to

Richardson's 911 call and one count for each of the four days he called Richardson from

jail.  He was also charged with one count of witness tampering for inducing Richardson

to absent herself from trial.

Richardson was not present at trial.  After opening statements, the parties

discussed admitting the two 911 calls between Richardson and the call center by

stipulating to their authenticity and Richardson's identity.  Defense counsel noted Cleary

was reluctant to agree to the stipulation and that he had explained to Cleary that the

14

hearsay issue was preserved after counsel had raised a hearsay objection pretrial and that the objection was overruled. Cleary ultimately agreed to the stipulation and the State played the two calls after the court read the stipulation to the jury.

Next, the State elicited testimony from the custodian of the jail calls. The custodian testified that inmate telephone calls are generally recorded and, to assist in identifying the caller, each inmate is given a PIN. He also testified that inmates sometimes use PINs that do not belong to them to make undetected calls and described how the jail's voice identification software allows one to attribute those calls to the inmate who made them. He then testified about the calls made under Cleary's PIN and those made by Cleary using other inmates' PINs.

The State then moved to admit the jail call recordings between Cleary and Richardson. Cleary did not object and the calls were played to the jury.

Cleary's central theory at trial was mistaken identity. Defense counsel argued in closing that because deputies did not have continuous observation of the man Richardson pointed to in the parking lot, there was a reasonable doubt that Cleary was that man. Defense counsel also argued that there was a reasonable doubt the voices on the jail calls belonged to Cleary and Richardson because they never identified themselves and the calls were made from other inmates' PINs.

15

The jury convicted Cleary on all counts and returned a special verdict for each count that Cleary and Richardson were members of the same household. The trial court imposed a standard range sentence of 60 months of incarceration.

Cleary appealed to this court.

## ANALYSIS

FORFEITURE BY WRONGDOING HEARSAY EXCEPTION

Cleary contends the trial court erred by admitting the jail telephone calls by *presuming* he was the caller rather than by finding he was the caller by clear, cogent, and convincing evidence. As explained below, Cleary did not preserve this claim of error and we decline to review it.

At the pretrial hearing, Cleary said he was not contesting identity "for the purpose of this motion." 1 RP (Oct. 13, 2020) at 30. At trial, when the State offered the 911 calls and the jail calls into evidence, Cleary did not object, but rather mentioned the objection he raised pretrial. But Cleary's pretrial objection expressly excluded the issue of identity.

With limited exceptions, we do not review claimed errors raised for the first time on appeal. RAP 2.5(a). Cleary does not demonstrate his claimed error meets any of the exceptions in RAP 2.5(a). We therefore decline to review Cleary's claim on appeal that the trial court erred by presuming he was the caller on the jail calls.

INEFFECTIVE ASSISTANCE OF COUNSEL

Cleary argues trial counsel was ineffective at the pretrial hearing for failing to contest identity. We disagree.

We review a claim of ineffective assistance of counsel de novo. *State v. Estes*, 188 Wn.2d 450, 457, 395 P.3d 1045 (2017). To prevail on an ineffective assistance claim, the defendant must show both that (1) defense counsel's representation was deficient, and (2) the deficient representation prejudiced the defendant. *Id.* at 457-58.

Defense counsel's performance is strongly presumed to be reasonable, but a defendant can rebut that presumption by showing that "'there is no conceivable legitimate tactic explaining counsel's performance.'" *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011) (quoting *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004)). Cleary fails to rebut the strong presumption of reasonable performance.

At the pretrial hearing, the State submitted overwhelming evidence that Cleary and Richardson were the speakers on the jail telephone calls. It was a closer question whether Cleary's statements caused Richardson's unavailability. Defense counsel's choice to concede an issue he could not credibly debate and instead debate a credible issue is not deficient performance. *Grier*, 171 Wn.2d at 33; *State v. Silva*, 106 Wn. App. 586, 597-98, 24 P.3d 477 (2001).

No. 38561-2-III
*State v. Cleary*

Also, this strategy did not prejudice Cleary. At the pretrial hearing, the State's evidence of identity was overwhelming. Had defense counsel contested identity, the trial court surely would have found by clear, cogent, and convincing evidence that the speakers on the jail telephone calls were Cleary and Richardson. Indeed, using much of the same evidence, the State successfully convinced a jury, *beyond a reasonable doubt*, of this fact. We reject Cleary's claim that he received ineffective assistance of counsel.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Lawrence-Berrey, J.

WE CONCUR:

_____          _____
Siddoway, C.J.                                       Fearing, J.

18